

ORDERED in the Southern District of Florida on October 15, 2018.

A. Jay Cristol, Judge
United States Bankruptcy Court

_____

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:

PROVIDENCE FINANCIAL     Case No. 16-20516-BKC-AJC
INVESTMENTS, INC.,
PROVIDENCE FIXED INCOME     Case No. 16-20517-BKC-AJC
FUND, LLC,     (Jointly Administered)

    Debtors.
_____/

MARIA YIP, as Trustee of Providence     **Adv. No. 17-1156-BKC-AJC-A**
Financial Investments, Inc. and Providence
Fixed Income Fund, LLC,

    Plaintiff,

v.

WILTON PEREZ, *et al*.,

    Defendants.
_____/

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ADVERSARY COMPLAINT</u>**

    THIS CAUSE came before the Court for trial on August 30, 2018 upon Plaintiff, Chapter 7 Trustee, Maria Yip's Complaint asserting five claims against Defendant Wilton Perez: (1)

Fraudulent Transfer pursuant to 11 U.S.C. § 548(a)(1)(A); (2) Fraudulent Transfer pursuant to 11 U.S.C. § 548(a)(1)(B); (3) Fraudulent Transfer pursuant to 11 U.S.C. § 544 and Fla. Stat. §726.105; (4) Fraudulent Transfer pursuant to 11 U.S.C. § 544 and Fla. Stat. § 726.106; and (5) Unjust Enrichment under Florida law. (*See* Adversary Complaint (D.E. 1).

## **FINDINGS OF FACT**

The Debtors operated a Ponzi scheme that defrauded over 400 investors of some $64 million. The primary perpetrator of the Ponzi scheme, Anthony Buzaneli, was found guilty of the fraud, and convicted of perpetrating the Ponzi scheme. There are approximately $60 million in claims against the Debtors.

The Trustee is seeking to recover commission payments made by the Debtors to Defendant as an "originator" – one who introduced investors to the Debtors for the purpose of selling them promissory notes as investments. The Defendant received commission payments from the Debtors in the amount of $256,263.43, for investor funds that he brought to the Debtors. The commissions were paid in 19 transfers from June 25, 2013 through April 17, 2016, while the Debtors were perpetrating the Ponzi scheme.

The parties do not dispute the foregoing, or the insolvency of the Debtor at the time of the subject transfers to Defendant. However, the Plaintiff asserts the Defendant knew or should have known of the Ponzi scheme and, therefore, cannot establish good faith and value. The Defendant contends he had no control over the Debtor's business affairs and no knowledge of Debtors' business operations or misconduct. Defendant asserts he earned his commissions pursuant to a valid contract he had with the Debtors.

In support of her claims, the Trustee testified that the Defendant knew Buzaneli was not paying investors when requested, and that the Debtors were having "liquidity" problems. The Trustee relies on several e-mails between Defendant and Buzaneli to prove Defendant knew or

should have recognized these signs as indicating the operation of a Ponzi scheme. On October 20, 2015, Defendant sent an e-mail to Buzaneli in which Defendant stated, "we have a problem with redemptions that are Absolutely Late, these clients are very unhappy, and letting our agents know about it." (Plaintiff's Exhibit 201). In the e-mail, Defendant referenced a particular client who had been requesting a withdrawal since August 2015 and was still waiting for his payment. Defendant added, "this client could turn into a big problem for us." (*Id*). Defendant's e-mail concludes:

> [T]he biggest problem I see with these late redemptions, is that our agents will lose confidence in Providence and will question the Liquidity of the company, and this WITHOUT question will trigger several redemptions and will hurt our business, these clients need an answer today when their money will be deposited, if not this issue WITHOUT question will become a much bigger problem very quickly.

On February 26, 2016, Defendant sent another e-mail to Buzaneli regarding a client (Dr. Etienne) who was requesting a redemption. (Plaintiff's Exhibit 207). To enable that client to receive his redemption, Defendant proposed that he (Defendant) purchase a promissory note that would replace the note of the client. Defendant stated:

> we want to send 50k for a personal new note for us, so; if you want; issue a new note on my behalf and send Mr. Etienne the same 50k for his cash flow, the net cash flow for the office is zero because we have 50k coming in and out, of course this is not common practice, but we really want to help this guy! Two business things are done here; Mr. Etienne will be very happy and willing to refer us additional clients, and Luis LUGO will be very motivated to keep bringing in new clients, and the net cash flow for the office is ZERO.

(*Id*). The Trustee testified that, while Defendant might not have known that a Ponzi scheme was being perpetrated, the Defendant's proposal was consistent with how Ponzi schemes are handled.

On March 3, 2016, Defendant e-mailed Buzaneli again regarding his replacing the client's note. (Plaintiff's Exhibit 208). Defendant stated that "Producers being paid late; will without question create concerns about the LIQUIDITY of the company," noting that late payments and problems with redemptions will most definitely change their faith in the liquidity of Providence.

(*Id.* (capitals in original)). Defendant, referencing a client who was awaiting a redemption, stated to Buzaneli:

> Antonio, we need to solve that as quickly as possible; if she goes to the Commissioner of financial Institutions, they will stop our Operation in Puerto Rico immediately, and we will not be able to pick new money at all!!

(*Id*). Defendant concluded the e-mail: "I just had a meeting with producers, and there is much concern about LIQUIDITY base [sic] on the facts discussed above." (*Id.* (capitals in original)).

The Trustee testified the Defendant invested $50,000 of his own funds with the Debtors, though no documents were admitted to confirm that transaction.

On cross-examination, the Trustee testified that the Defendant did not receive any bonuses; and, she confirmed the Defendant did not have access to the business operations of the Debtors. However, she reiterated that the Defendant did have knowledge of the Debtors' "liquidity" problems.

The Court also heard the testimony of the Trustee's expert, Marcie Bour, CPA. Ms. Bour is a forensic accountant who was engaged by the Trustee to review and investigate Buzaneli and the Ponzi scheme, and to determine the solvency of the Debtors. Marcie Bour did not investigate the Defendant. She found that Buzaneli controlled the operations of the Debtors; and, she confirmed that Defendant was not a signatory on the Debtors' bank accounts. Ms. Bour further found that the Debtors were insolvent at all times relevant to the transfers to Defendant, and Debtors' insolvency deepened and worsened over time. Finally, the expert testified she examined the contract between the Debtors and the Defendant and thought the commissions paid thereunder were high.

The Defendant presented no witnesses or evidence at the trial.

The issues raised by the evidence are whether the commissions are avoidable constructive or actual fraudulent transfers and whether the Defendant gave value in good faith.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§157(a) and 1334, and this proceeding is a core proceeding under 28 U.S.C. §§157(b)(2)(A) and (H).

## **CONCLUSIONS OF LAW**

The Court finds that the evidence, introduced without objection, proves that the Debtors' enterprise as a whole was operated as a Ponzi scheme, and the Debtors were insolvent during the period Defendant received his commission payments. The Court also agrees with the Trustee that the income and investments generated for the Debtors by the Defendant was the "lifeblood" of the Debtors' Ponzi scheme operation, enabling Debtors' corrupt management to continue its fraud until its inevitable demise.

The Court concludes, however, that the Defendant did not know of the Debtors' Ponzi scheme operation while he was working to obtain investors for the Debtors. Although the emails between the Defendant and Buzaneli indicate the Defendant knew the Debtors had a liquidity problem, the Court does not believe the e-mails prove that the Defendant knew the Debtors were operating a Ponzi scheme. The Court believes the term "liquidity", as used by Defendant in the e-mails relied on by the Trustee, referred to the Debtors' cash reserves that would assure the Debtors' ability to pay debts or meet probable demands as they arise. These emails show Defendant knew that Debtor's cash reserves were insufficient to meet the redemption demands of the investors, but the Court cannot conclude that the Defendant knew that the inability to pay the redemptions was the result of Buzaneli's misconduct and the consequential misappropriation of funds by Buzaneli and the other convicted principals during their operation of a Ponzi scheme.

From the e-mail exchange, the Court concludes that Defendant knew the Debtors did not have the liquid assets to fund redemption requests, but the Defendant did not know that the Debtors

were insolvent because they were operating a fraudulent "business".  As the Trustee testified, the Defendant was not privy to the operations of the Debtors, and the evidence did not otherwise prove the Defendant was aware of Debtors' internal accounting or balance sheet issues. Moreover, Defendant was not a target in the criminal cases, which resulted in the plea agreements entered into by the principals of the Debtors, including Buzaneli, who admitted to perpetrating the fraud.

Contrary to the Trustee's position, the Court is not persuaded by the testimony that Defendant's $50,000 contribution, if indeed made, demonstrates Defendant knew of the Ponzi scheme.  The Court believes the evidence indicates it is just as likely the Defendant would not have made such a contribution had he known the Debtors were operating a Ponzi scheme that would be unable to pay a return on the investment.  In addition, the Court believes Defendant's e-mail of January 27, 2016 demonstrates that he had no knowledge of the fraudulent Ponzi scheme, as it is likely he would not have pressed Buzaneli to register the Debtors with the State Department in Puerto Rico. (Plaintiff's Exhibit 202). Defendant stated he believed it was a good idea for the Debtors to be duly registered and authorized to do business.  The Court believes the Defendant may not have suggested registration with the government if he were aware of the Debtors' fraud.  The Trustee has not proven the Defendant was aware of or involved in the fraud.

Florida Statutes 726.105 and 726.106, and 11 U.S.C. 548 authorize the trustee to avoid transactions that effectively remove property from a debtor's estate that should properly be used to repay creditors.  *Balaber-Strauss v. Sixty-Five Brokers, (In re Churchill Mortgage Inv. Corp).*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000).  Pursuant to these statutes, a trustee may avoid transfers made with "actual intent to hinder, delay, or defraud," and transfers that are constructively fraudulent because the debtor did not receive "reasonably equivalent value" or "fair consideration" in exchange for the property transferred while the debtor was insolvent. *Id*.

Pursuant to 11 U.S.C. § 548(a)(1)(A):

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

In addition, under section 544 of the Bankruptcy Code, the trustee can avoid and recover a fraudulent transfer under the Florida Statute 726.105(1)(a), if the trustee proves the debtor made the transfer of its property within four years prior to the petition date, that the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor, and that the debtor has at least one unsecured creditor:

> 1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.,

It has been held that a debtor running a Ponzi scheme possesses actual intent to hinder, delay or defraud. *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2014); *Churchill*, 664 B.R. at 675 (citing *Martino v. Edison Worldwide Capital (In re Randy)* 189 B.R. 425, 438 (Bankr. N,D.Ill. 1995). In this case, the evidence establishes that the transfers of the commissions to the Defendant, made by the Debtors while perpetrating a fraud, were made with the intent to hinder, delay, or defraud creditors.

However, as the Defendant argues, he provided the Debtors value for the commissions, in good faith. Section 548(c) of the Bankruptcy Code provides:

> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, *a transferee* or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or *may retain any interest transferred* or may enforce any obligation incurred, as the case may be, *to the extent that such transferee* or obligee *gave value to the debtor in exchange for such transfer* or obligation. (Emphasis added).

So too, Florida Statute 726.109 provides:

> 1) A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

Thus, even though the Trustee in this case has proven Debtors paid the commissions to the Defendant within the requisite time periods under the statutes (which is not disputed), and with the intent to hinder, delay or defraud, she may not recover the commissions paid to Defendant if he took them for "value and in good faith" under the Bankruptcy Code or for "reasonably equivalent value" under Florida law.

The Court believes Defendant's good faith has been established.  The Court has already determined that the Defendant did not know of Debtors' fraudulent business operations, despite knowledge of Debtors' liquidity problems.  From the documents presented and the Trustee's own testimony, the Court believes the Defendant had no intent to participate in the fraud perpetrated on the Debtors' creditors.

> When transfers occur in the ordinary business transactions under ordinary business terms to an unaffiliated third party in an arm's-length transaction for exactly equivalent value, such a third-party transferee with no actual knowledge of the underlying fraud has acted in good faith regardless of whether a retrospective examination of the circumstance might indicate that it was aware of the facts that could have put it on notice of the fraud.  Such a transferee is "innocent of wrongdoing and deserving of protections."

*Martinez v., Hutton (In re Hartwell)*, 628 F.3d 1312 (11th Cir. 2010). Accordingly, the Court finds Defendant's good faith and lack of knowledge have been proven as required by 11 U.S.C. 548(c) and Fla. Stat. 726.109.

The issue remains as to whether Defendant gave value to the Debtors in exchange for the commissions, to avoid liability under section 11 U.S.C. 548 and Fla. Stat. 726.105. Although the Defendant did not present any witnesses or testify on his own behalf, the contractual agreements he had with the Debtors were admitted into evidence by the Trustee. The accounting of the transfers received by the Defendant are also in evidence and were not disputed. Ms. Bour provided limited testimony regarding the contracts under which the Defendant was paid the commissions, specifically stating that the commissions seemed high, but she did not say how high or what she considered the reasonable rate.

Relying on the analysis in *Merrill v. Allen (In re Universal Clearing House Company)*, 60 B.R. 985 (D.Utah 1986), this Court concludes that the Defendant's services constituted "value" in consideration for the commissions he received, pursuant to 11 U.S.C. 548(c). *Universal Clearing House* involved a Ponzi scheme. Merrill, as trustee of one of the clearinghouse companies involved in the Ponzi scheme, brought an adversary proceeding to recover funds that the debtors paid to its sales agents as commission payments for inducing investors to invest with the clearinghouses. *Universal Clearing House*, 60 B.R. at 989. The Bankruptcy Court "held as a matter of law that because the [brokers'] services deepened the debtors' insolvency and furthered a fraudulent scheme, the services were 'without legally cognizable value.'" *Id*. at 998.

However, the District Court reversed, concluding that the brokers' services did in fact constitute "value" in consideration for the commissions under Section 548(c). The District Court in *Universal Clearing House* stated:

> Under the present Bankruptcy Code, satisfaction of a present or antecedent debt constitutes value. See 11 U.S.C. § 548(d)(2)(A). In these cases, the debtors contracted with [brokers] for the sale of [investor] contracts. Pursuant to their contracts, [brokers] performed services thereby giving consideration to the debtors under the terms of their contracts. Accordingly, the debtors incurred the obligation to pay [brokers] for their services. That obligation constituted a debt that was satisfied by the payment of commissions pursuant to the contracts. The satisfaction of the debts to [brokers] falls squarely within the definition of value found in 11 U.S.C. § 548(d)(2)(A).

*Id*. at 998–99. The District Court concluded that "a determination of whether value was given under section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." The court in *Universal Clearing House* held that, as a matter of law, the services provided by the brokers did constitute value, as that term is used in section 548 of the Bankruptcy Code. 60 B.R. at 1000.

In *In re Financial Federated Title & Trust, Inc*., 309 F.3d 1325, 1331–33 (11th Cir. 2002), the Eleventh Circuit adopted the reasoning in *Universal Clearing House*, 60 B.R. at 998–1000, explicitly determining that, under 11 U.S.C. 548, value is measured by the objective value of the property received by the debtor or by the subjective benefits the debtor derived from the property. In *Federated Title*, a bankruptcy trustee sought to avoid transfers made to an individual who had provided services to a Ponzi scheme debtor. *Id*. at 1331. The bankruptcy court and the district court both concluded that the individual could not have provided "value" to the debtor because any services that furthered a Ponzi scheme necessarily rendered the entity conducting the Ponzi scheme more insolvent. *Id*. The Eleventh Circuit rejected that reasoning:

> [B]y the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances.... We conclude that a determination of whether value

>was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.

*Federated Title*, 309 F.3d at 1332 (quoting Universal Clearing House, 60 B.R. at 998–1000).

Like the brokers in *Universal Clearing House*, the Defendant in this case was retained and paid to produce investors to the Debtors for the purpose of selling them promissory notes as investments. The evidence in the record and the Trustee's testimony confirm that the Defendant produced investors who paid approximately $1.1 million dollars to the Debtors, thereby giving value to the Debtors. As a result, Defendant was contractually due a commission from the Debtors. *See, Churchill*, 664 B.R at 680. The Court therefore concludes that the evidence proves the Defendant received the commission payments for value and in good faith.

Notwithstanding the fact that Defendant's services provided value to the Debtors, the commission payments are excessive. The evidence establishes that the Defendant was to be paid commissions ranging from 6.5% to 7.5% per annum, depending on the period of time of each contract. He did not receive any bonuses. The only evidence introduced at trial on the amount of value that the Defendant gave the Debtors was in the Trustee's testimony. The Trustee testified that the Defendant brought to the Debtors approximately $1.1. million in investor funds. If the Defendant received $256,263.43 in transfers, which he does not dispute, then he received about 23% as commissions on the investor funds – not the approximate 7% provided by contract.

The Trustee has argued that the services rendered by the Defendant for the Debtors during the operation of a Ponzi scheme had the effect of perpetuating the Ponzi scheme, and therefore no value has been conferred. The Court stated that it agrees that the brokers, including Defendant, were the "lifeblood" of the fraudulent operations which allowed Debtors' principals to defraud

investors of millions of dollars. However, that is not what is considered when determining value under section 548(c).

> Fraudulent conveyance law is grounded in equity and is designed to enable a trustee or creditors to avoid a transfer in a transaction where the transferee received more from the debtor than the debtor received from the transferee. The remedy of avoidance seeks to rectify the disparity between that which the transferee gave and that which the transferee got in the transaction. It is this disparity that makes it equitable to require the transferee to repay the excess in value of what he received over what he gave up in the transaction.

*Churchill*, 664 B.R 682. *See also, Federated Title*, 309 F.3d at 1332.

In this case, the evidence indicates that the commissions paid were in excess of the value of the Defendant's broker services for which the Debtors contracted. The Defendant was paid about 23% in referral fees as opposed to the contract rate of 6.5-7.5%. Accordingly, the Trustee is entitled to avoid and recover the excess 16% in commission payments that exceeded the approximate 7% contract rate, or $176,000.00.

As to the remaining counts of the Complaint seeking to avoid constructively fraudulent transfers, under 11 U.S.C. 548(a)(1)(B) and Fla. Stat. 726.106, the Court finds the evidence supports avoidance of the excessive commission payments, based upon the foregoing conclusions. Section 548(a)(1)(B) provides, in pertinent part:

> **(a)(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
>
> ***
>
> **(B)(i)** received less than a reasonably equivalent value in exchange for such transfer or obligation; and

And, Fla. Stat. 726.106 provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made

>the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The analysis regarding value under both sections 11 U.S.C. 548(a)(1)(B) and Fla. Stat. 726.106 focuses on the benefit actually obtained by the debtor in the transaction.

Therefore, to prove the commission payments are avoidable, the Trustee must prove that the Debtors received less than reasonably equivalent value. The record establishes that the Defendant provided services to the Debtors pursuant to the contract with the Debtors, bringing in over $1.1 million in funds to the Debtors. For that, the Defendant agreed to be compensated at 6.5-7.5%. Instead, Defendant received 23% in referral fees, an amount in excess of the rate established between the Debtors and Defendant. The commission payments Defendant received for providing services to the Debtor were in excess of the reasonably equivalent value of such services, as established by the parties' agreements.

Finally, with respect to the Trustee's claim for unjust enrichment, the Court has found that the Defendant earned his commission payments by producing investors for the Debtors, as his contract with the Debtors provided. However, the Defendant's commissions were not reasonably equivalent in value to the services he proved to the Debtors. Thus, to the extent they were excessive, the Defendant was unjustly enriched. It is therefore

ORDERED AND ADJUDGED that final judgment will be entered in favor of the Trustee and against Defendant, Wilton Perez, on all counts of the Complaint, and the Trustee may recover from the Defendant, Wilton Perez, the sum of $176,000.00 as excessive commission payments.

###

Copies furnished to:

Maria Yip, Trustee
Wilton Perez, Defendant
Brian West, Esq.

*Attorney West shall serve a copy of this Order on all interested parties and file a Certificate of Service with the Court.*